LODGED
CLERK, U.S. DISTRICT COURT
09/11/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ____AP____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
09/11/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ____KC____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHARLES ANGEL SALVA,<br><br>Defendant. | Case No. 5:24-mj-00380 |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about September 9, 2024, in the county of San Bernardino in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 49 U.S.C. § 46504 | Interference with Flight Crew Members and Attendants |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
Complainant's signature

FBI Special Agent, Theodore L. Augustus
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 11, 2024

_____
Judge's signature

City and state: Riverside, California

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Cory L. Burleson (951-276-6945)

## **AFFIDAVIT**

I, Theodore L. Augustus, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint and arrest warrant for Charles Angel Salva ("SALVA") for a violation of Title 49, United States Code, Section 46504, Interference with Flight Crew Members and Attendants, which occurred on September 9, 2024, while aboard Frontier Airlines flight 3581, which departed John Wayne Airport for San Francisco International Airport but had to be diverted for an emergency landing at Ontario International Airport in Ontario, California.

2. The facts set forth in this affidavit are based on my personal observations, my review of various law enforcement reports, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. **BACKGROUND ON THE AFFIANT**

3. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been employed since August 2020. I am currently assigned to the FBI's Riverside Resident Agency of the Los Angeles Division. I am currently assigned to a squad

that investigates domestic terrorism violations. I have a Bachelor of Science in Economics from the United States Naval Academy, Maryland. I have a Certified Fraud Examiner certification from the Association of Certified Fraud Examiners, Texas. I received an Honorable Discharge after serving five years in the United States Marine Corps as an Air Traffic Control ("ATC") Officer and Intelligence Officer, served as the Marine ATC liaison for USCENTCOM, conducting counter-intelligence operations, and led multiple operations overseas for two campaigns. I am currently in the United States Marine Corps Reserves serving as a Weapons and Tactics Training Program Officer.

4. I have received 23 weeks (approximately 920 hours) of instruction in the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia.

5. In the course of my employment with the FBI, I have investigated a variety of domestic terrorism and Indian country violations, including trespassing, bombing matters, assaults, murders, and crimes against children. I have participated in numerous aspects of criminal investigations, including the interviewing of witnesses and subjects, physical surveillance, analyzing data from electronic devices, the execution of search warrants, and the arrest of individuals wanted for various violations of federal and state law. I have also personally participated in the execution of search warrants involving the

search and seizure of electronic devices, vehicles, and documents of criminal activity.

6. As an FBI SA, I have received instructions in the identification, collection, and preservation of evidence, photography, latent print collection, electronic device seizure and processing, and crime scene investigations. I have also assisted with criminal investigations, including sorting information; interviewing witnesses, victims, and suspects; and collecting evidence to support the filing of complaints and search warrants.

7. In addition to my formal training and military experience, I have learned from and worked alongside numerous FBI agents with years of experience in criminal investigations. Throughout my experiences with these agents, I have received training, guidance, and real-time experience in various investigative techniques, including interviewing, evidence collection, surveillance, and data analysis.

### III.   SUMMARY OF PROBABLY CAUSE

8. Title 49, United States Code, Section 46504 states, in pertinent part, "[a]n individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or conspires to do such an act, shall be fined under title 18, imprisoned for not more than 20 years, or both."

9.   On September 9, 2024, SALVA flew on Frontier Airlines flight 3581 ("FA 3581"), from John Wayne Airport in Santa Ana, California, destined for San Francisco, California.  During the flight, SALVA assaulted two Frontier Airlines' flight attendants, Flight Attendant 1 and Flight Attendant 2, by choking Flight Attendant 1 using the lanyard around Flight Attendant 1's neck and by kicking Flight Attendant 2 approximately six times causing injury to Flight Attendant 2's leg.  Flight Attendant 2 returned to the rear of the plane for the remainder of the flight, and thus, was unable to perform Flight Attendant 2's normal job duties.  Crew members, including Flight Attendant 1 and Flight Attendant 2, also had to focus on restraining SALVA, which interfered with their duties and reduced their ability to provide service to the other 87 passengers on board the plane.  Additionally, as a result of SALVA's actions, FA 3581 was diverted to Ontario International Airport in Ontario, California, for an emergency landing.

### IV.   STATEMENT OF PROBABLE CAUSE

**A. SALVA Assaulted Flight Attendants, Causing Plane to be Diverted**

10.   Based on my review of multiple Ontario Police Department ("OPD") reports written by officers who responded to the incident and conducted witness interviews, and my review of Frontier Airlines' in-flight incident reports written by Flight Attendant 1, Flight Attendant 2, and Captain Pilot 1, I know the following:

11. On September 10, 2024, at approximately 5:18 p.m., FA 3581 departed John Wayne Airport in Santa Ana, California, destined for San Francisco International Airport in San Francisco, California.

12. Shortly after takeoff, while the plane was climbing and under 10,000 feet, flight attendants saw that the oxygen masks above seats 18D, 18E, and 18F were out of the overhead compartment. Flight attendants, including Flight Attendant 1 and Flight Attendant 2, went to row 18 to assess the situation, and they found that a passenger in row 18, later identified as SALVA, had his hand in the overhead compartment.

13. According to an FA 3581 passenger, Passenger 1, who was interviewed by OPD Officer Matthew Ross, Passenger 1 was seated in row 19, and SALVA was seated in seat 18D. Passenger 1 told Officer Ross that SALVA appeared claustrophobic, and Passenger 1 said that it seemed like SALVA wanted to get off the plane. Passenger 1 said that SALVA pulled the oxygen mask down from the overhead compartment. In doing so, SALVA got his hand stuck in the overhead compartment, and Passenger 1 helped SALVA get his hand unstuck.

14. When Flight Attendant 1 arrived at row 18, Flight Attendant 1 noticed that SALVA looked sweaty and out of breath. Flight Attendant 1 reported that SALVA began yelling obscenities, and that SALVA said "we are all going to hell," and "this airplane is going down." According to Flight Attendant 1, SALVA then "attempted to violently grab" at passengers, and Flight Attendant 1 tried to restrain SALVA. SALVA ran towards

5

the rear of the plane, ignoring Flight Attendant 1 and other flight attendants' commands, so Flight Attendant 1 asked for assistance from other passengers. While Flight Attendant 1 and others were trying to restrain SALVA, SALVA grabbed the lanyard around Flight Attendant 1's neck and said, "I'm going to choke this bitch." Using Flight Attendant 1's hands, Flight Attendant 1 was able to remove SALVA's hands from Flight Attendant 1's lanyard, but SALVA squeezed Flight Attendant 1's fingers in the process. Flight Attendant 1 later told OPD Officer Alicia Morris that Flight Attendant 1 did not lose consciousness and had not struggled to breath while SALVA was attempting to choke Flight Attendant 1. According to Officer Morris' report, Officer Morris saw two small red marks on Flight Attendant 1's neck.

    15. According to Flight Attendant 2, when SALVA grabbed Flight Attendant 1's lanyard, SALVA also pushed Flight Attendant 2's upper chest "with force" and said he was going to kill everybody. Passengers then helped restrain SALVA, and Flight Attendant 2 went to the rear of the plane to retrieve flex cuffs and notify the captain. When Flight Attendant 2 returned, SALVA was "swinging and kicking everyone." Flight Attendant 2 reported that SALVA was "strong and in a violent uncontrollable rage." Flight Attendant 2 also reported that SALVA broke out of two sets of flex cuffs, and that multiple passengers attempted to hold SALVA down. While the passengers attempted to restrain SALVA, SALVA kicked Flight Attendant 2's right calf approximately six times. Flight Attendant 2 then went to the

rear of the plane, where Flight Attendant 2 remained until the plane landed in Ontario. Flight Attendant 2 later told OPD Officer Consuelo Duran that Flight Attendant 2's right leg was numb, and Flight Attendant 2 requested medical attention. In her report, Officer Duran said that Flight Attendant 2's right calf appeared bruised and swollen. Flight Attendant 2 was eventually taken to a nearby hospital for evaluation.

16. SALVA's actions interrupted and interfered with Flight Attendant 1, Flight Attendant 2, and other crew members' ability to complete their job responsibilities.

17. According to Captain Pilot 1, FA 3581's pilot, Captain Pilot 1 and the co-pilot decided to divert FA 3581 to Ontario Internation Airport instead of proceeding to San Francisco because the flight attendants did not feel safe trying to put SALVA back in his seat.[1]

**B. Information about SALVA and SALVA's Statements**

18. According to OPD Officer Mark Hardy's report, Officer Birdsong, Officer Ross, and Officer Hardy boarded FA 3581 once it reached the gate at Ontario International Airport. When the officers boarded, SALVA was being held down by passengers, including SALVA's brother, Passenger 2. SALVA's hands were restrained with plastic flex cuffs and a seatbelt. The officers escorted SALVA off the plane, up the jet bridge, and out of view of other passengers. As officers escorted SALVA, SALVA

---

[1] According to Captain Pilot 1, they decided to divert to Ontario over returning to John Wayne Airport because John Wayne Airport had been busy when they were on the ground there.

repeatedly made nonsensical statements, and he repeated what the officers were saying. Officers removed the flex cuffs and seatbelt from SALVA's wrists and placed SALVA in handcuffs. However, because SALVA was acting erratic, he was eventually placed on a gurney, restrained with soft cuffs, and transported to a local hospital pursuant to California Welfare and Institutions Code § 5150.

    19. Officer Morris interviewed Passenger 3, SALVA's sister-in-law. According to Officer Morris' report, Passenger 3 said that Passenger 3's family, including Passenger 3's husband (Passenger 2), were flying back to San Francisco with SALVA and SALVA's three-year-old daughter. They had been at Disneyland over the weekend. Passenger 3 also said that on Sunday, September 8, 2024, SALVA left his daughter with Passenger 3 and their family and then disappeared. Passenger 3 said that no one knew where SALVA had gone, and that they could not get ahold of him for the rest of the day. Passenger 3 said that they later received a call from the Anaheim Police Department, who told them that SALVA had been found at a liquor store covered in sewage.

    20. Regarding the plane incident, Passenger 3 told Officer Morris that Passenger 3, Passenger 2, and their children were seated near the front of the plane while SALVA and his daughter were towards the rear. Passenger 3 said that Passenger 3 heard a disturbance behind Passenger 3 shortly after takeoff, and when Passenger 3 looked back, Passenger 3 saw that SALVA had pulled the oxygen mask down from the ceiling. Passenger 3 said that

SALVA was yelling obscenities, and that he yelled he had raped multiple people, including Passenger 3 and Passenger 3's children. Passenger 3 said that Passenger 3 knew SALVA's statements were not true, but that Passenger 3 did not know why he was acting the way he was acting.[2]

21. Officer Hardy went to the local hospital and conducted a Mirandized interview of SALVA. It is my understanding that the interview was recorded on Officer Hardy's body-worn camera, but I have not yet reviewed that recording. I know the following about SALVA's interview after reviewing Officer Hardy's report:

    a. Officer Hardy read SALVA his Miranda rights before conducting the interview, and SALVA stated that he understood his rights and proceeded with the interview.

    b. SALVA initially stated that he was upset that his plan to kill everyone on the plane to get back at them did not work.

    c. SALVA then said, "I'm a child molester," and he said he had molested his three-year-old daughter multiple times in Fremont, California, before he lost his custody rights.[3]

---

[2] Passenger 3 also told Officer Morris that SALVA suffers from severe depression, is a pathological liar, and has attempted to commit suicide in the past.

[3] Officer Hardy contacted Child and Family Services in Alameda County to follow up on SALVA's statements, but they were unable to provide additional information because the child's mother's name was not known.

      d.    SALVA also made vague statements about an incident that occurred with a 14-year-old female at Buffalo Wild Wings in Fremont, California.[4]

      e.    Regarding the incident on the plane, SALVA admitted to using ecstasy before boarding the plane.

      f.    SALVA said that, during the flight, he thought everyone was trying to get him to admit his crimes, so he tried to pull the emergency flight button so the plane would crash.

      g.    SALVA admitted that he damaged the oxygen mask compartment above his seat.

      h.    SALVA admitted that he assaulted two flight attendants, saying that he punched one flight attendant one time and choked another flight attendant.

      i.    SALVA admitted that the flight attendants he assaulted did not provoke him to assault them.

      j.    SALVA said that he assaulted the flight attendants because he did not want anyone to know he was a pedophile.

      k.    SALVA said that he heard voices saying words that triggered thoughts of him being a pedophile.

---

[4] Officer Hardy contacted Union City Police Department and Fremont Police Department to follow up on SALVA's statements, but neither department had any documented incidents consistent with SALVA's statements. Union City Police Department informed Officer Hardy of an October 2021 police report, where SALVA's ex-girlfriend had reported that SALVA was in a relationship with a 15-year-old female, though the female was never identified. Fremont Police Department informed Officer Hardy of an October 2021 court order report, where SALVA claimed the mother of their child was not abiding by their child-custody arrangement.

## V.   CONCLUSION

22.   Based on the information described above, there is probable cause to believe that SALVA violated Title 49, United States Code, Section 46504, Interference with Flight Crew Members and Attendants.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this  11th  day of September,
2024.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE